Good morning, Your Honors. My name is Russell Petty representing you and Christine Calanto. Calanto, may it please the Court, with the Court's permission, I'd like to take five minutes to reserve for rebuttal. Sure. The four issues that I'd like to talk about this morning, any one of those issues independently requires that the judgment against my client be reversed, Your Honors. The first of the issue is whether the Iowa notice requirement with respect to not just insurance policies but contracts generally is within a risk of savings clause. I submit that it's not. It's a rule of general application, not directed at the insurance industry and has at best only a de minimis impact on the risk spreading function. The second issue is assuming that Iowa state law applies, the fact that the Iowa courts do not treat notice provisions as mandatory condition precedents outside of the third-party context where they clearly have a different meaning and intent than they do in the first-party context that we're talking about here. And there's only been one case cited to this Court, the Pickle case, that involves at all how the Iowa courts would treat a notice provision in a first-person context. And neither the district court nor MetLife even addressed that case, much less explained why our analysis is incorrect. The third factor I'd like to talk about is assuming that Iowa law applies and assuming that the notice provision does in fact constitute a mandatory condition precedent, Ms. Colano has provided significant and unrebutted evidence that MetLife was not prejudiced by the untimely submission. And the fourth ---- What's the answer to that? Well, the answer to that, Your Honor, is I submitted a declaration listing 11 MetLife cases that I've personally seen and reviewed the files. And in none of them was there, for example, an IME done or any attempt to ---- Well, okay. But, you know, they have the right to ask for one. And this is an unusual case because the injuries happened so long ago. And is that the best answer that you have, is that you've never seen them do it or ---- Your Honor, the ---- and frankly, the Court doesn't have to take my word on it. There's ---- you know, as I was preparing for oral argument, I just looked at a bunch of MetLife cases. There's lots and lots of reported decisions involving MetLife in the, you know, ERISA context. And they don't perform, as the Court could see for itself, they don't perform a contemporaneous examination. At any time, all they ever do is get the medical records, provide the medical records to their ---- to a nurse and sometimes to a ---- to a treating physician, and at that point, they make a determination as to whether the insured has submitted enough evidence in order to ---- Isn't it also true that the way the plan notice provisions are set up, they wouldn't have a right to even get the medical information or the proof of disability until nine months after the disability began, so the asserted disability. In other words, my understanding is you have six months to submit the claim after the disability begins. And you have another 90 days to submit the proof because it says that proof of such disability must be submitted no later than 90 days after the beginning of the period for which monthly benefits are payable. So that's nine months. So they're never going to have a right to contemporaneous medical exam because the best they're going to have a right to is nine months later. Well, that's exactly correct, Your Honor. And as someone who practices in this field all the time, I mean ---- I'm not going to be why they don't do them because they're never contemporaneous. Well, you know, that's not in time. And I've seen lots of times also where, you know, a doctor, you know, and doctors are always doing this. I mean, they're always being asked their opinion. Okay, you examined someone yesterday. Was this person disabled three, four years ago? Doctors routinely, they take the stand every day in the Central District of California and in cases where it's at issue and give opinions as to whether someone was disabled two or three or four years ago. So there's no reason why that couldn't be done. There's no reason why in this case MetLife couldn't have called Ms. Colano's treating positions and said, you know, what are your opinions as to her restrictions and limitations back in October of 2001? The fact is they didn't do that because they didn't feel they had to need to. But anybody who practices in this field as a regular basis, and you can see this by looking at the reported decisions, is there's always people making opinions as to someone's medical condition years and years ago. Also, in terms of, I mean, in a way this is all kind of foolish because, I mean, really the reason that they're not precious, it seems to me, is that they say, and the district court said, and it may be true, that on this record she hadn't proved that she was disabled. And it was only if it would be a marginal case. In other words, only, it seems to me, if they really thought the records demonstrated that she probably is disabled, would they go get an independent medical exam in order to disprove what the records look like. But if the records look weak, then they're less precious to not have an independent exam. Well, there's two points there. I agree with that completely. The first point, of course, is that they, MetLife always takes the position that, well, you know, you've got to submit evidence. And until you reach a certain quantum of evidence, we're going to deny the claim. So, you know, they should never be prejudiced because all they really have to say is, well, we haven't seen enough evidence yet, so the claim is going to be denied. But more significantly, I stringently object to the notion that Ms. Colano's disability is even an issue here. The fact is, is MetLife did no evaluation whatsoever to determine whether she was prejudiced. They didn't look at the medical records. They didn't provide the medical records to one of their in-house physicians. And for them to be coming in now and at the district court level and using their attorneys to look at the medical records and say, well, well, we don't think that these show that she's disabled or we don't think this is good enough proof, that's just fundamentally unfair. That argument cuts against them being prejudiced. Because the more the records, in their view, show that she wasn't disabled, then the less likely it is that as an insurance company that doesn't, at least we've never seen evidence of a medical exam, they actually did, because they haven't come up with one, it becomes less likely they would have done one. And the weaker they think the evidence is. I think that that's exactly right, Your Honor. I'd like to get to the first point that I'd like to be talking about, which is the preemption issue. One of the prongs of the Miller test, I think the most significant prong of the Miller test, is whether the State rule at issue has a significant impact on the risk spreading function. The MetLife's response to that mirrors what the district court did, which is just to say, well, you know, the California rule has been held to have a significant impact on the risk spreading function. But isn't the question really? I mean, the Iowa rule does have a prejudice piece. It switches the burden, but it has a prejudice piece. And the question is whether the non-insurance version of Iowa contract law has a prejudice piece. And there doesn't seem to be any evidence that it does. There does, Your Honor. And I submitted some supplemental authority just this morning. That's a good question. And it was something that I went and looked for as I was preparing the case for our argument. Well, we don't have the supplemental authority, at least I don't. The two cases that I submitted, Your Honor, if the Court will bear with me, are Van Ort Construction, which is an Iowa Supreme Court case, and Alliant Energy Corporation. Both of those cases, in a non-insurance context, looked at the issue of what happens when you've got contracts, a contract or a series of contracts, that provide mutual promises. And what happens when one of the parties breaches one of those, you know, conditions or mutual promises? Is the other party excused from performance? And the Iowa Supreme Court in Van Ort said, well, we're not going to excuse the non-breaching party from performance. If the breaching party can show that the failure to comply with the condition or its portion of the promise was non-material. And then the district court in the Alliant Energy Corporation case, applying Iowa law, did that in the context of a fairly complicated arrangement, where one entity had licensed out the use of its name to a- Does your opposing party have this, you know? I emailed the letter that I submitted this morning to Mr. Renner yesterday, so hopefully he's had an opportunity to look at it. But the point is, this materiality examination, it's the exact same examination with respect to prejudice. I mean, I think it's just general contract law. If I'm a company that supplies coal for a living, and Mr. Renner has a power plant, and I'm supposed to deliver a load of coal to Mr. Renner today under the contract, and I don't get it to him until tomorrow or the day after, you know, that doesn't work a forfeiture of my rights under the contract, barring at least some discussion. But what about for damages? Pardon me, Your Honor? What about for damages? You know, well, again, he has to prove that he was damaged in some fashion by that late delivery of contract. He can't simply say, aha, you failed to comply with this one aspect of it, so I'm not paying for your coal, and the contract is over. It doesn't work a forfeiture. Now, mind you, it's my burden under general contract law to come forward with some evidence explaining why it is that Mr. Renner and his power plant weren't burdened by the fact that it took me a day or a week or however long in order to deliver that lump of coal. But that's just basic contract law, and it's frankly no different in Iowa than it is in California. I note that in the Ward case, where the Supreme Court held the notice prejudice rule was preempted, it specifically looked at the placement of the burden as being the key issue making the California rule different for insurance companies than general contract law, because the parties argued in Ward that in all cases, you know, the law abhors a forfeiture, and there are steps that can be taken by the breaching party in order to avoid the forfeiture of its rights. And in Ward, the Supreme Court says, yes, that's right, but the California rule is unique because it places the burden on the non-breaching party rather than the breaching party, and that's what makes this rule unique to the insurance industry and different with respect to the insurance industry than with respect to the non-insurance industry. The MetLife's argument, again, is that, well, notice prejudice rule of California is preempted, and so, therefore, the Iowa law must be saved from preemption, so, therefore, the Iowa law must be saved from preemption as well. You know, again, the first prong of the Miller analysis is whether it's a significant burden. I don't think, you know, we can have a debate, a reasonable debate as to what impact the Iowa rule has on the risk-spreading function, but I don't think that anybody can argue credibly that it doesn't have a different impact. Well, if we were to agree with you, then we'd have to go make up a rule of our own. Is that right? Well, I think that's exactly right, Your Honor, and this Court has already kind of done that once in the Cisneros case. There were actually two decisions that were issued, and the first decision, when it first approached the notice prejudice analysis, it said, well, this is clearly a rule which is safe from preemption, but even if it's not safe from preemption, we're going to say that it's something that we should apply general Federal rule, and that Federal rule We would then end up with this really weird situation where you would have states that have a burden on the employer, on the company rule or on the plan rule would not be preempted, and in the other states, you would have a Federal rule which was the same rule. So everybody would have the same rule, but some would have it as a matter of state preemption, of state non-preemption, and some would have it as a matter of Federal law. Well, I mean, I think that is exactly what I'm arguing, but I think that's part of the nature of the beast of ERISA. In ERISA, the – when Congress passed ERISA, numerous courts, including this one, have said one of the intent was to have a uniform rule of, you know, rules that would apply to ERISA plans across the 50 states. However, we're going to say from preemption state law is regulating insurance because each state should have the ability to regulate its own law, and so the question is, is whether these rules are rules regulating insurance or not. And what rule would you have us adopt? What would you have us say the rule ought to be? In a perfect world, Your Honor, what I think the rule should be is that the – I mean, just application of the Miller test shows that the Iowa notice rule is not a rule governing insurance. Therefore, it is not saved from preemption, and so therefore, this Court has to fashion Federal common law. What would you have us fashion the rule to be? Yes. What would it be? The rule would be no deadline. So deadlines don't matter at all, or what? Well, you know, the vogue among the 50 states, which I think is a good place to look, is the same way that California has done it, which is simply to say that the – the – when a claim is submitted late, the insurance company has the burden of coming forward and showing prejudice. And if it's unable to show affirmatively that it was prejudiced by the untimely submission, then at that point, it's not allowed to rely on its notepaper. So in a case like this one, what would it show? Suppose if it came back and showed – would it be good enough for it to come back and show that in some percentage of cases in which the timing is like this, they do – they would ask for a medical exam and they didn't have a chance to do that? Or would they have to show what the medical exam would have showed, for example? Well, to sort of – before I get to that precise question, I mean, there's already a lot of – not a lot of law, but there's already law in this circuit, Cisneros, for example, that addresses under the California rule what the insurance company has to show in terms of prejudice. And I think it makes sense – I don't think it makes sense to have a different Federal rule. I think it makes sense to sort of import that rule. But, Your Honor, I think that if you had someone, for example, who, you know, had a radical change in their condition from the point at which they were disabled until, you know, and so it becomes – Well, she did say here – I mean, there is a medical record that says that the medical record from a year after her onset, alleged onset, that she's gotten much worse in the last year. Well, you know, Your Honor, this is a situation where there was a steady deterioration of this woman's – But there is a medical record that says exactly that. She reports that she's gotten much worse in the last year. The – Your Honor, it's entirely, entirely possible. I mean, the analysis has never been done. It's entirely possible that when MetLife, if they're ordered to do a remand here, actually looks at this, and they contact all the treating physicians, and the treating physicians say, well, I can't give an opinion as to disability in the fall or winter of 2001 because I just don't remember, or I threw out my medical records, and, you know, somebody else, you know, their current treating physician says, why was I treated here? Well, they have to do that. I mean, she came forward with medical records. So they have to – they have to go find more medical records than she came up with. Well, you know, there are records out there, Your Honor. For example, the Social Security record, which is a contemporaneous record. Could you briefly, because you're a veteran of time, comment on this Perkle case and your number of three issue, I think? Okay. Your Honor, and I'm glad you asked me that, because I don't think I did a very good job of explaining this in the briefs. I think that Iowa law has a two-step process when they're dealing with one of these timing clause. The first step is just to say, looking at the contract, is this a mandatory condition present? Is this something which, you know, the parties bargained for, is something that has to be done before any rights under the contract are due? And then the second step of it is to say, well, you know, now that we've determined it's a mandatory condition precedent, the issue is whether the breaching party, the party that failed to live up to the condition, can show some justification or excuse in order to, you know, get away from the fact that it failed to live up to that condition. What I think  Perkl stopped after the first prong. And Perkl said, look, in the context of first party insurance, I mean, it didn't use this term, but I mean, I think that's what its intent was. In the context of first party insurance, we don't think these timing provisions are that important. They're very important in the third party context, because, you know, the insured has been sued, and it's the insurance company's nickel, and the insurance company's got to take steps right away in order to protect its rights. And in some of these third party cases, the, you know, insurance company was only notified after a default judgment had been issued against it, against its insured that it was now responsible for. But that doesn't exist in the first party context. Roberts. I know you wanted to reserve some time, Mr. Pate. So thank you. Pate. Thank you, Your Honor. I appreciate it. Roberts. Good morning. Robert Renner. May it please the Court. My name is Robert Renner, and I, along with Scott Calvert at Counsel Table, represent the Eppolese, in this case, Metropolitan Life Insurance Company and Group Insurance Plan No. 625. In an overview for my presentation here today, I'd like to first address one of the cases cited in the Pellissery Plybrief, because I believe it clarifies a significant overlay to the Iowa notice prejudice rule set forth by that State's Supreme Court in Grinnell. In that regard, I will next address the United States Supreme Court's test in Miller, which is a case in which the United States Supreme Court has ruled that Miss Colano is guilty of misdemeanor assault, and why Iowa's rule is saved from preemption. Finally, I will I want to speak a little bit about the extraordinary circumstances, or the unique circumstances presented in this case, and the extraordinary relief that Miss Colano seeks from this panel. First of all, at page 15 of Appellant's reply brief, Miss Colano cites Metcoil Systems Corporation v. Columbia Casualty Company. It's a 1994 case by the Iowa Supreme Court. At page 654, and the site is 524, Miss Colano cites Metcoil Systems Corporation v. Columbia Casualty Company. It's a 1994 case by the Iowa Supreme Court. Northwest Seconds 650. At page 654 of that case, the Iowa Supreme Court lays out that State's notice prejudice rule along the lines of Grinnell. However, it concludes by adding a significant overlay as follows. Quote, only when the insured has satisfactorily shown excuse or legal justification, such as reasonable mistake or trivial occurrence, does the burden to show actual prejudice fall upon the insurer. Unquote. That is to say, the rebuttable presumption and burden-shifting approach of Iowa's notice prejudice rule returns to the type of rule applied, for example, by California. All right. If we apply that rule here, why don't you lose? I'm sorry? If we apply that rule here, why don't you lose? Because they came forward with some evidence that the district court correctly found that she did not reasonably comply with the terms of the plan. Okay. She further found that Ms. Colano had not demonstrated a lack of prejudice to MetLife, and that there was no excuse. And on that question, why didn't she show enough to shift the burden? What did she profer? She proffered two declarations, one from Mr. Petty and one from Mr. Cantor. Which said in 120 we've done 120 cases and in all of them, none of them, did MetLife. That's not what the declaration said, Your Honor. That is what it said. The declaration specifically say that in the cases virtually none or worth along nothing, they expressly recognize it. It's not that the district court was clearly erroneous in her assessment of those declarations. Outside counsel, outside plaintiff's counsel, should not be the ones commenting on what is or is not MetLife's standard penalty handling practice. Why? Why? Because it's only based upon the cases that they see. That's correct. A limited subset of them. But there are a fair number of them, and it's at least a pretty some indication. You can't afford to do nothing. They themselves recognize that there were exceptions because Mr. Petty in his declaration specifically noted a case where a contemporaneous independent examination had been done. I don't even know why we worry about this. There are records, medical records, contemporaneous to the time of her working. Of her working or her disability? Well, she had to have been covered. But that's what. Okay. She saw the doctor, didn't she, around October of. 2003. Yeah. No. No, 2000, 2001. She had been under a doctor's care. She had been under a doctor's care, Your Honor. Why couldn't they look at those records and see if they are sufficient to establish the disability? As set forth in the one of the early footnotes in the opening brief of Appellant, it seems to be that they don't even pinpoint what is the date of disability. They argue dates in 2001. It could be possibly back to 1961. The only document that we have as from the claimant is her employee statement. And there she was asked what date did the disability begin. And she writes 1961. It was mild. No, I guess what I'm asking, why can't they look at her medical records circa October 19, 2001 and see if she's in a coma or see if she's working or see what her situation is? Why couldn't they look at the records that were extant and make a judgment? Well, I believe they should have the right to do a point in time analysis of. Under the plan, they don't. Because the plan does, am I right in reading the plan as not requiring that any records be or any information be submitted until nine months after the date in which disability is being claimed? Is that right? That is the outside timeline. Okay. So what we really ought to be looking at is whether they were in a worse position than they would have been had she done it nine months later as opposed to contemporaneously. Your whole brief is set up as if she had to do it contemporaneously. But she didn't have to do it contemporaneously. She had to do it at least nine months later, not more than nine months later. Right. But I think there's a significant gap in time between the nine-month period allowed under the plan, and that's the maximum period of time, versus the more than two years after the fact. As to what? What's the prejudice at that point? And given, as Judge Silverman says, that there are records available both before October 2001 and also during that nine-month period, there are some substantial records available, including some x-rays. So what's the prejudice? The prejudice is, again, the lack of a contemporaneous independent medical examination, as well as the fact that the plan was approved in October 2001. Contemporaneous nine months later.  More than nine months later, because it's the same. The issue is she's no longer working there, so the issue is the doctor, at the time of the exam, would have to extrapolate back to the period of her employment, because if she gets disabled outside after the policy expires, she's not covered. The only attending physician statement in the record that we have in connection with Metlife's claim is one submitted by Dr. McMenamin, October of 2003. He wasn't even senior at that time. He's the only one certifying Georgia's disability. There are gaps in the records around her time of being laid off. There's actually a fair amount more than the district court acknowledges. There are a series of records from August and September. You characterize them as being about her sleep issues, but in fact, if you look at them, they're quite, I mean, the reason she's having sleep issues is because she's in pain, and that's what she's saying. Your Honor, there was a gap in the 2001 time period, and there were affirmative statements. I'm sorry. What was the gap? There were records from August, September, and December. Is that right? Well, the one in December 4 of 2001, Your Honor, says that she's thinking of trying for disability. That doesn't matter, but there are records. You could have looked at them. You could have said this record doesn't show she's disabled, but there are records. Again, because as the district court correctly found, she hadn't reasonably complied, substantially complied with the provision. There was a lack of showing of prejudice to met life, and there was no excuse for her failure to do so. Okay. But in the medical records, there are affirmative statements regarding her improvement when she was using drug use. Okay. So then you should have looked at the records and said she loses. Okay. So fine. So you could have looked at the records and said she hasn't proven that she was disabled at that time, but that's what you haven't done. Well, again, it's a multiple-step and burden-shifting approach under Iowa's notice of prejudice rule. So I think at the end of the day, the district court's conclusion was correct. My point of McCoyle is only that we do return to the California type of notice of prejudice rule in which the burden is squarely upon the insurer. And that's why under the Miller test, it does meet both the specifically directed toward the entities engaged in insurance as set forth by Ward, talking about it governs the insurance relationship distinctively, as well as being insurance specific. How do you account for the fact that Social Security was able to find that she was disabled retroactive to October 15, 2001? I don't know what records they did or didn't have. There were some, admittedly, records that were submitted as part of the administrative appeal by Ms. Kalana's counsel at the University of Iowa. But that's certainly part of the prejudice inquiry, i.e., they had some information and you could have gotten it. Well, I think we did get it because it was submitted in the course of the administrative appeal. All right. So if you thought it led to an opposite conclusion, then you could have come to that opposite conclusion. But you had the – if you had as many records – well, you could have had the same records that Social Security had, then if they thought they could make a decision, why couldn't you? Well, I don't think the Social Security Administration's decision is binding upon the insurer. I'm not saying that. I'm not asking for the decision to be binding. I'm asking for the – isn't it evidence of non-prejudice that the agency thought it had enough – had enough information to make a decision, whether you would have made it the same way or differently? Well, I think it – I think that may well be true for the purposes of Social Security Administration. It's not – it's not sufficient evidence under the terms of the plan in terms of having a specific date of disability, and she never identified a specific date of onset. Well, but the specific date – the specific date is before her termination. At least she has to prove that. But you never got to that point because you said you weren't going to look at it. For the reasons that the district court correctly noted, that there hadn't been substantial compliance and that there was not a showing of prejudice to MetLife. Yes, but that's what we're trying to find out. Why wasn't there a showing of – an adequate showing of no prejudice to at least shift the burden to you? Because – well, I don't know what else to say other than the declarations from the counsel are insufficient as correctly found by the district court. Again, they're commenting on only a subset, and they recognize that. But that's not all of it. There's also the fact that there was more information available than the district court recognized, and that the Social Security Administration had enough evidence to make a decision. So there are at least – there – it's not that there wasn't information available, and there wasn't information available that an agency thought enough, and that there wasn't at least some evidence that you don't ordinarily ask for medical exams. And I'm very influenced by the fact that your plan is not set up to get contemporary medical exams, because it's set up so that it can be – it has to be more than nine months later before you're going to get such a right. Well, I think it also presumes that the claimant is submitting medical information that does show contemporaneous disability around the time that she's claiming disability. If she doesn't, she loses. If she doesn't, she loses. I mean, if she doesn't come forward with the evidence, she loses. Again, I think the analysis of Grinnell is akin to the California Notice of Prejudice rule in terms of getting back to the insurance – the burden being on the insurer to show actual prejudice at some point. The Grinnell decision does talk about Grinnell. There was a factual finding at page 534 of the decision saying that finally the court found that Grinnell did not show that the delayed receipt of notice of the stuck-in-suit prejudice did. So again, I believe we do meet the Miller test for finding that the rule is not preempted by ERISA or that it is – and it is saved from preemption. The bottom line, I think, is that there will be people who were diligent and will be able to have their claims reviewed on a substantive basis. During Mr. Petty's opening statement – opening presentation, there was a discussion of the letter brief that was submitted. I did receive it yesterday. He did email it to me. However, I would note that what he's citing are two cases, one from 1999 and one from 2004. And it's my understanding, based upon the notice of cases set for hearing, is that it should be cases decided since the filing of the party's last brief. In addition, there was no reason why it shouldn't – it wasn't submitted seven days before. But in the end, those cases aren't talking about the Notice of Prejudice rule. They're merely talking about general rules of application. And I think the case law that we cited does talk about such Notice of Prejudice rule being specifically directed toward the insurance industry. We cited the Doe case out of New York. That's a no prejudice rule that was found to be saved from preemption. And then we also cited the Dang case, which talked about the Oklahoma rule, also having an overlay to it, much like Iowa's, in terms of whether there was an issue with the law.       Kagan. And I think that's the case that we cited. Kagan. But how do you account for the Perkle case? Was it an outlier? I mean, or they were confused or what? Well, I think it is an outlier case, and I think it's also the same court. But it's the same court. This isn't a – I mean, I don't know the Iowa system hierarchy, but it was all Iowa Supreme Court cases, right? It was – it was cited or decided 18 years prior to Grinnell. And I think there was a refinement in the notice of prejudice rule. I wasn't thinking – is that right? And I guess what I want to return and conclude with, you know, here we have an ERISA case filed in Central District of California. There's a trial that's conducted and results in a detailed 44-page ruling by District Judge Morrow, with her findings of fact subject to the clearly erroneous standard of review. I have a question about that. Was there any discovery request made in this case? I don't recall any. Could there have been? Mr. Petty could have requested discovery, of course. He could have? I'm sorry? He could have requested discovery, of course. I mean, we – it was not a case of a summary judgment motion. This was, you know, the court set up as part of a – Was this case before – in the district court before or after Abadi? It was before. And before Abadi, my recollection is that there was a general understanding that discovery wasn't available, even in a de novo. Not necessarily, Your Honor, because, again, under Atwood, the case that Abadi overruled, the cases discussed the – it was a burden-shifting approach under that as well. Right. And that the plaintiff had to show material – actual material probative evidence of – And there was some confusion, as I recall – I don't have the cases in front of me about whether you could – whether and under what circumstances you could get to show it. I believe it's fair to state that – I wouldn't – I wouldn't hesitate to say that pre-Abadi, there were cases allowing discovery under RISA, so I think that – But it never came up in this case. Nobody tried it. I don't – you'd have to ask Mr. Petty. I don't want to misrepresent the state of the record, but it's my recollection that there was no request for discovery in the case. And, again, in large part, Ms. Kalan doesn't even challenge any of District Judge Marle's findings. And I think it's important to recognize that Ms. Kalan now asks this panel of the Ninth Circuit to declare both that Iowa's notice prejudice rule is preempted by RISA and that a notice prejudice rule along the lines of California should be imposed under the guise of Federal common law. I don't think that this Court should accept her invitation, especially where it's here. Well, suppose we were to get to Federal common law. What would the rule – what rule should we adopt? I don't think there's any reason to adopt Federal common law because you have to have a notice prejudice rule. I don't know if that is what I asked you. I asked you if I thought – if we were to get to Federal common law, what rule would we adopt? I don't know which rule the Court would be inclined to adopt because here there is a notice prejudice rule that has – has – has to be – All right. So the answer is you won't – so you won't answer my question. It – well – You're refusing to answer the question. The Iowa notice prejudice rule does have California's aspect after imposing certain preliminary aspects on the claimant, and I would submit that they are reasonable aspects that are – that are put on there. But it's not what I asked you. Hypothetically, if – if a California rule applied, would it change the result in the case? I don't – I don't know that it would, Your Honor, because I think MetLife could have shown actual prejudice because of the significant time that it took before – between the time that the disability arose, arguably in 1961, or 1999, or, you know, choose your date based upon the kind of shell game that's suggested by the opening brief in terms of the multiple choice possibilities, and then the time that – that MetLife was given to analyze the – the actual claim. But especially here – But MetLife – if the California rule applied, wouldn't MetLife at least have to have come forward with some showing that they do, with some regularity, ask for medical exams? Because that's your ultimate prejudice. Is there any other prejudice you're claiming other than not being able to conduct a medical exam ten months later? I think the other prejudice would be that she hasn't specifically – has she met her burden under the plan to come forward with satisfactory proof of her disability in terms of identifying a specific date of disability and having a contemporaneous – But then she – you're really confusing – you really are the prejudice question and the merits, because if she hasn't come up with adequate – made an adequate showing, then you just look at her showing and you say she loses. So that doesn't prove prejudice. What you have to prove is that for some reason, because of the lapse of time, you couldn't have done what you could have done earlier. So what's the prejudice? I think in addition, it would be that we don't know if witnesses are still around in terms of the doctors who were seeing her at the time and or documents that were available at the time are now lost or destroyed. Did you – did any of that evidence come out? I mean, did you – has MetLife ever made any claim, any explanation to her, any explanation to the district court as to what? Because the Grinnell decision was the one advanced by Ms. Colano in her administrative appeal. That's the test that we were using, and that's the test now that Ms. Colano, interestingly, wants to avoid for a number of reasons. But it was her suggestion in the administrative appeal that the Grinnell decision was the one that was applied or to be applied, and therefore, there was no discussion of the California-type notice of prejudice rule in terms of the burden being on the insurer to show actual prejudice. And if – to go back to Judge Silverman's question, if the California rule applied and you had this hypothetical problem about documents could have been lost, I presume you would have had a proof that documents were lost. You couldn't have just said hypothetically they could have been lost. You would have had to say – you would have had to ask for information, and you would have had to find out that something wasn't available that would have been available earlier. So there is a difference about how it would have been – would have proceeded. I think that's true. If the California rule applied, then we would have to show actual prejudice by showing that the documents had been destroyed in the intervening timeframe or witnesses lost, things like that, yes. But again, I think here the Court should decline her invitation to impose that type of notice of prejudice rule, particularly here where neither the State court in Iowa nor the Eighth Circuit has made such a pronouncement, and this case does not warrant such extraordinary relief. Thank you, Your Honor. Thank you very much, sir. Mr. Petty, you've got a couple minutes left. Thank you, Your Honor. The – first, to address the Court's question with respect to discovery, a body does provide some limited rights for a risk of plaintiff to take discovery in order to challenge the standard of review when it's abuse of discretion. This was the DeNovo case, and so because of that, we didn't feel it was appropriate to take discovery. Well, actually, that's backwards. I mean, my understanding is that even before a body, you could have had the Scaravina and DeNovo case. The – it's tough to get discovery out of the district courts, Your Honor. I mean, we've been able to use a body for that. But it would make a whole lot more sense if you had asked them to come forward with evidence regarding what their actual practice is, for example, with regard to medical exams. Is there any reason you couldn't have done that? Well, you know, again, Your Honor, we probably wouldn't have. I mean, just practically speaking, and I'm sorry, Your Honor, we probably wouldn't have gotten the evidence. I mean, you know, Mr. Renner and I have had numerous battles over the subject of what evidence an ERISA plaintiff is able to get. Occasionally, most of the time, we're able to prevail when it's – when this Court has expressly said we're allowed to use extrinsic evidence in order to challenge a standard review. And if you're allowed to use extrinsic evidence to challenge a standard review, there has to be some way to go out and get it. But in a DeNovo case, in order to obtain substantive evidence, you know, you just have to pick your battles, Your Honor. The – with respect to the – my declaration, Your Honor, you're exactly right. The district judge misread what I said, and it's clearly erroneous, because Judge Morrow said that one example I've said where there had been a contemporaneous examination done. And you didn't say that. You said you never got to that. Yeah. What I said was the one example where it was different, where they just denied the case on procedural grounds. And my declaration is in the record. And your colleague said, I've done a hundred cases, they've never asked for it. I can't say they've never asked for it in any other case. That's what he said. He said he has no recollection of them ever asking for this. So there is no evidence in the record at this particular point in time of MetLife ever doing a contemporaneous examination. It's a hundred-and-something cases that you guys did only. And with respect to the objection that I'm testifying as an expert, you know, I mean, an expert would be if I said, well, I've got all this knowledge of the insurance industry, and because of that, I say blank. I mean, I was testifying for what I saw. I don't have to know anything about insurance whatsoever to say this is how MetLife has done this in all the other cases. Thank you very much, Mr. Petty. Mr. Renner, thank you as well. The case just argued is submitted. Thank you very much, Your Honors. Good morning.
judges: Silverman, Berzon, Bybee